Good morning. May it please the Court, Ryan Mahar on behalf of Petitioner, the Center for Biological Diversity, which I'll refer to as the Center. I'd like to reserve five minutes of my time, please. Your Honors, EPA approved Arizona's plan for regulating minor sources of air pollution despite two faulty exemptions in the plan. First, Arizona included an exemption for agricultural equipment used in normal farm operations from all permitting requirements and regulation. Second, Arizona exempts all sources with emissions below its permitting thresholds from regulation and permitting. The Clean Air Act and EPA's regulations require that states demonstrate that their plans assure compliance with the National provide that assurance here. Any exemptions must be de minimis and entirely inconsequential to attainment of the National Ambient Air Quality Standards. These standards set the maximum concentrations of certain dangerous pollutants and are essential to protecting human health and welfare. Congress did not want agencies gambling with such high stakes. So, with respect to the ordinary farming equipment, what is it that you say they should have provided they didn't provide? Your Honor, Arizona should have provided some assessment of the types of sources that would fall within the exemption. They didn't provide any information as to what equipment might fall within the exemption. They detailed certain exceptions to the exemption but did not provide an assessment of what equipment or its emissions. So, what is it that you wanted? I'm sorry, what is it that you wanted? You wanted them to describe the kinds of tractors that would be used? Or, I'm not exactly sure what it is that you want. Yes, Your Honor. An inventory of sources would be important to this step of the exemption. Okay, and when you use the euphemistic term, inventory of sources, what are you talking about? Are you talking about tractors? A list of various sources. There are examples. If Arizona had provided a list of tractors, what would that have told us? EPA's regulations require modeling in addition. Okay, now that's a very different point and EPA disagrees with you on that one. We'll come to modeling if you want to talk about that. But I thought you wanted to talk about the list of sources. I'm just trying to figure out what it is they were supposed to provide. An inventory of sources is too euphemistic. So, I need chapter and verse here. Certainly, Your Honor. A list of sources would be a good place to start, including tractors. From there, you could assess the emissions. And what should they have done with the tractors? Did you want them to run each tractor that might be used on an Arizona farm and describe what its emissions are? Because that's not really the concern. What was it here? It wasn't really the pollutants from the tractors themselves. It was the dust. Your Honor, dust is not the only pollutant of concern here. There are assumptions that could be used to generally understand what emissions from different pieces of equipment amount to and the threat that those emissions pose to the ambient air quality standard. So, you could use some assumptions or heuristics to make that leap. You don't have to assess each individual source, but EPA and Arizona did nothing here. And that's our point. There are also growing technologies that were not assessed whatsoever, like anaerobic digesters, which convert manure into methane gas. And those pieces of equipment are growing in number and they produce nitrogen oxides and carbon monoxide, two pollutants for which there are ambient air quality standards. Yet, there's no assessment of the potential effect of that equipment on the ambient air quality standards or how it fits within the exemption. Instead, we have EPA relying on the safeguard. Because EPA does not actually include any assessment of the types of equipment that might fall within the exemption, and it just depends on this regulatory provision under which Arizona will find out about violations after the fact and rectify them. And the safeguard is really defective here for two reasons. First, under EPA's regulations, a state cannot allow construction of a source that will contribute to a violation of the ambient air quality standards in the first place. So, what Arizona is doing here is allowing construction and then asking questions later. And that approach directly contradicts EPA's regulations, as EPA acknowledges in its response to our comments in the final rule. The safeguard that EPA relies upon to assure compliance when it comes to the agricultural equipment exemption is also defective because Arizona will rely upon citizen complaints and inspections under the Agricultural Best Management Practices Program to discern violations of the National Ambient Air Quality Standards. But a violation of the air standards is not so cut and dried. It's not as easy as seeing oil in water and understanding that there's a spill. The enforceability... Forgive me for interrupting. I'm still unclear about your answer to Judge Bybee's questions and my question about... I'm just focusing now on the farm equipment. So, I'm looking at what the EPA says in response to your comments and says, second, the commenters take issue with the ADEQ's explanation that it expects the overwhelming majority of emissions from agricultural equipment used in normal farm operations to be fugitive emissions. So what exactly should... If I understand your argument, in part, it is that simply saying, trust us, that's where it's mostly going to be, is not sufficient under the law. So the question then is, what would be sufficient under the law? And I'm still very unclear as to what you think would be sufficient. And you also, and this came up briefly in Judge Bybee's question as well, you referred to modeling. Now, I am just an ignorant, barefoot federal judge. What is modeling as applied to this kind of situation? Yes, Your Honor. So, EPA's regulation requires air quality modeling in this situation. Yes. My question is, what is modeling? Yes. So, modeling takes several forms, but essentially it involves an inventorying or listing of potential sources, existing and future, because this permitting program will apply to future sources. Assumptions about the emissions that might arise from those sources. And then an incorporation of meteorological data, topographical data, an assessment of background levels of pollution, since they're potentially interstate. So that's what you say should have been provided as respecting the equipment? Yes, Your Honor. And even if the court determines that EPA's regulation does not require modeling here, something was required, rather than, as you say, an explanation based on trust us. Because what EPA bases its assessment of, bases the fact that it thinks the plan assures compliance with the NAAQS on, is Arizona's experience. Courts have found that an agency can't just generally assert experience to justify its actions. The Supreme Court in State Farm, we cite a Third Circuit case, Sierra Club, on page five of our reply brief. And this makes sense, because an agency that relies on its experience to justify any action, really doesn't present an opportunity for a court to assess the agency's actions, or for the public to push back on what the agency has done. An agency could get away with a lot, if it's simply relying on the explanation of experience, and that's sufficient to support a conclusion. Instead, you need facts in the record, and we don't have that here. We have general assumptions and a reliance upon experience. And modeling is required under EPA's regulations. You're looking at 2.2E? Correct, Your Honor. And EPA has addressed that comment on page 29 of the record, that's at 31931 of the Federal Register. And they said that they disagree with your reading of their regulation. Their reading is that when modeling is done, you have to show your work. But the modeling is not required to support every set. Yes, Your Honor, and we disagree with EPA's position there. And the plain language of the regulation instructs that modeling is required. And what does the plain language tell us then? I've got it open, so where does it say? I don't have that quoted in front of me. I can provide that to the Court. Well, I have it in front of me. Okay, so to paraphrase, it requires modeling to demonstrate compliance with the NACs, especially when read in conjunction with subsection D, which requires states to demonstrate that their plans are assuring compliance with the NACs. And that also corresponds, we have two different EPA interpretations here, because EPA's original interpretation of that subsection was that modeling is required in all but limited circumstances, quote-unquote limited, where it's clear, quote-unquote clear, that there will not be a violation of the NACs. So that's the original EPA understanding of its own rule. And here we have what amounts to a post hoc rationalization, where EPA is asserting that modeling is required when it feels like it, because that's a convenient position for the agency to take here. And again, even if the Court concludes that modeling was not required here, something was required, rather than just a general explanation premised on agency experience and conclusory statements by the state of Arizona in its 2020 submission, where it says that most emissions from agricultural equipment will be fugitive without providing any further support for that. And then also where it says most agricultural equipment will be located with equipment covered under the new source performance standards, but doesn't provide any information beyond making that general statement. If I may, Your Honors, I'd like to turn to the permitting thresholds. So the permitting thresholds are based on one half of what are called significant emissions rates, which are drawn from separate unrelated EPA regulations. And there's no rational relationship between these significant emission rates and the national ambient air quality standards. The significant emissions rates, and therefore the permitting thresholds, are based on annual emissions, which take the form of tons per year. But there are ambient air quality standards that are hourly, that are assessed on an hourly basis. And to try to use annual thresholds to defend and make sure that hourly standards are protected is somewhat like getting pulled over for speeding, going 70 in a 50 mile per hour zone, and then asserting as a defense that you couldn't have been speeding because you'd only traveled 100 miles in the last two hours. Equipment can be dormant for periods of the year, which brings down their annual emissions on average. But then when it operates, maybe correlated with the harvest or something, an annual harvest or some other intermittent activity, in those periods of operation it can still violate the hourly NAAQS. So emissions thresholds, the permitting thresholds being based on tons per year, really doesn't have a rational connection to hourly ambient air quality standards. EPA disregards this and relies on Arizona's assessment of the percentage of emissions that are covered, that are regulated under these permitting thresholds. However, emissions are not a surrogate for concentrations of pollution. And the ambient air quality standards are based on concentration. EPA failed to consider important aspects of the problem here because emissions are just one piece of the puzzle. As we discussed with respect to the agricultural equipment exemption, you have to account for emissions, topography, you have to account for background levels of pollution, you have to account for the location of sources. So a source that is located along a lonely country road will have a different implication for ambient air quality concentrations than a source that's wedged between an airport and a town. EPA only considered emissions in its reliance on Arizona's assessment and failed to account for these other important elements of the problem. For these reasons, your honors, EPA failed to support its conclusion with facts in the record and also failed to consider multiple important aspects of this problem. For that reason, the court should vacate. Thank you. I'd like to reserve the rest of my time unless there are any questions. Not seeing any. Thank you. Thank you. I don't have any questions, although I had trouble following your speeding analogy because I only take the subway. Sorry, that's a Southwest route. May it please the court, Alan Greenberg, United States Department of Justice, on behalf of the respondents, United States Environmental Protection Agency, and its administrator, Michael Regan. The final rule before this court completes EPA's approval of Arizona Department of Environmental Quality's significant rewrite of its new source review program to create a much stronger regulatory program. This strengthened regulatory program includes a revised minor new source review program that now regulates many more sources of emissions that were regulated under the prior minor new source review program. In fact, most of these were not regulated at all under the prior program. As part of this new program, EPA has also approved several exemptions from the minor new source review program so that inconsequential sources of emissions do not need to seek permits or registration. EPA's approval is reasonable under the act. The Clean Air Act requires a program for the regulation of minor new sources as necessary to assure that national ambient air quality standards are achieved. The relevant regulations expressly allow a state not to regulate certain types or sizes of minor sources if the state determines that such regulation will not interfere with attainment or maintenance of the NAAQS. Here, ADEC chose to exempt two such sources, the construction or modification of agricultural equipment used in normal farm operations and the construction or modification of sources with emissions below certain reasonable thresholds. EPA reviewed the facts and explanations ADEC provided. What was the explanation for the ordinary farm equipment? It's simply that in our experience it's not going to give rise to any meaningful emissions. Why is that good enough?  The first part of the explanation is that ADEC identified the normal farm operations that would be subject to this particular exemption. That was one of the deficiencies EPA had identified. The court was asking questions about what more do you need. Here, ADEC listed seven or eight specific activities that it defined as part of normal farm operations. It's a very limited number of operations. Second, the Arizona Department of Environmental Quality did rely upon its experience in regulating over the last decades agricultural emissions. That is an appropriate thing for EPA to rely upon. How does ADEC regulate agricultural emissions? Are we talking about point sources? There can be point sources and non-point sources, Your Honor. For fugitive emissions, they have, in certain geographic areas, best management practices that are set up. This was at issue in the V-Hill, V-Levitt case, which I did want to bring to your attention. There are also regulation of point sources. As we note in our brief, if agricultural sources use internal combustion engines to pump water or pump waste or generate electricity, those are all subject to new source performance standards. How do the activities that ADEC identified here, I saw that there was some suggestion that if you had a farm that had a point source, that somehow these other things would get incorporated into the regulation of that. How does that work? If you've got an internal combustion engine that's being used to run your irrigation, that's a point source and is subject to some regulation. Am I correct on that? If the emissions from that internal combustion engine exceed the threshold, then it would be subject to minor new source review. If it's then subject to minor new source review, fugitive emissions are also calculated and addressed in whatever permitting or registration is required. Similarly, if that engine or other point source is a major source, then a permit, prevention of significant deterioration permit, or a non-attainment NSR permit would be required. Again, fugitive sources are addressed in that regulatory permitting structure. We are dealing with just one small component of the clean air regulations. As we noted in our brief, there's Title V permitting, there's new source performance standards, there's hazardous air pollutant standards. This is just for construction and modification of sources, new sources, and again, subject to these limited exemptions. I want to return, if I may, Your Honor, to the Court's decision in V. Hilvey-Levitt, because it's quite analogous. In V. Hilvey-Levitt, this Court was addressing Arizona's need to assure implementation of best available control measures, another aspect of new source review. The Court held that it was permissible for EPA to rely on Maricopa County's explanations for the choice of best available control measures to regulate emissions from agricultural sources in that case. In that case, there was no modeling, there was no data. The State of Arizona, or Maricopa County, had very limited information as to the relevant factors. And this Court concluded, and I quote, Arizona offered a reasoned explanation for the choices it made, and EPA was within the bounds of its judgment and expertise to approve it. The Court should reach the same conclusion here. Arizona did offer explanations for its agricultural equipment exemption. It provided the limited list. It then explained that based upon its experience, farm emissions tend to consist almost exclusively of fugitive dust. That is a fact in the record. It's an explanation upon which EPA can rely. Does fugitive dust come within the Clean Air Act, though? I mean, does that need to be regulated? If somebody's running a lot of trucks and ATVs up and down dirt roads and kicking up a lot of dust, does that still come within the Act? It's under various systems. It's not under the New Source Review Program. Mobile sources aren't covered there. But if an area, for example, is not in attainment with a particular NAAQS, the state has to develop an attainment plan to regulate the various sources that are contributing to the non-attainment. And in that context, the state may impose standards on farming activities, on off-road activities, and other dust-generating activities, so that if, for example, an area is not in attainment for a particular matter, which is generated as a source by dust, that source can be regulated. Would you turn to the modeling question? Certainly, Your Honor. This strikes me as a little bit ambiguous. As I look at the regulation at the beginning, it says that this Appendix 5 sets forth the minimum criteria. That's 1.0 at the introduction. Minimum criteria, 2.0 is the following shall be included. That includes the administrative materials. Then 2.2 is the technical support. And it doesn't have any introductory language. It just launches into things, including E, which is the modeling information. And it just says, modeling information required to support. And that leaves us ambiguous as to whether it is required or in a case in which somebody has provided it, whether they have to show their work. I mean, I think there's an ambiguity there. And so I'm a little unclear, because there isn't any introductory language here to tell us under 2.2 what we do with A, B, C, D, E, and F. Certainly. First, the context of 2.2E. This is a list of things that a state needs to submit in order for their submission to be deemed complete. So it is not a substantive rule, but rather a procedural rule that lists things that need to be submitted. And turning to the actual— Does that mean then that modeling needs to be submitted in order for an application to be complete? Not for every submission, Your Honor. And we think the language is clear, but even if it's ambiguous, we think EPA's interpretation is certainly reasonable. Here, the language is that the submission shall include, quote, modeling information required to support the proposed revision. Petitioner's reading would remove the word required. They would simply want it to say, which it doesn't, that the regulation, 2.2E, would simply read that SIP submissions shall include modeling information to support the proposed revision. That's not what it says. Rather, it says only submit modeling that's required to support the submission. But you're reading it very similar to F, which says evidence, comma, where necessary, comma. Does the required serve the same purpose as where necessary? Because it could say modeling information, comma, where necessary, comma, to support the proposed revision. Yes, it could, Your Honor. We read the required to perform a similar function as the when necessary. And this is not a new or post hoc rationalization by EPA. EPA articulated this rationale in 1990 when it promulgated this provision in response to comments and noted that in limited circumstances that modeling is not required for every SIP submission. And that is certainly the case. There's numerous kinds of SIP submissions for which modeling is not required to support the submission. The submission in V-Hill would be an example. If you have a submission that consists solely of the state's assertion of what its experience indicates, would that be consistent with the regulation? It could be if those explanations... So all those things that are listed there, like modeling and so forth, we can dispense with that, and all we need to do is, under your interpretation, is say to a submission to the EPA, well, our experience is this won't be a problem under the Clean Air Act period. Well, that's not quite what the state said. The state identified specific factors. I know, but you're saying that experience can be sufficient, and you cite that case and so forth. Yes. And what I'm questioning is how far do you take that? It can be sufficient for any and all requirements for a submission? For certain submissions, yes. Which ones? Well, for example, in this case, I would say it is, particularly because none of the comments identified contrary facts that would place into question Arizona's explanation here. Arizona said almost all these emissions, overwhelming majority from farm equipment, are fugitive emissions. No one came in and said, no, that's wrong. And so on this particular record, EPA can look to what Arizona submitted, the facts and the explanations, and say... Are you saying that it's not enough for them to say, we don't think there's any support for this proposition, that they have to say, well, we went out and looked at a few farms last week, and we saw all sorts of problems. Where in the statute does that burden put on them? As you articulated, that isn't their burden. EPA has to determine that, in this case, the minor new source review program will assure, as necessary, attainment of the NAAQS. Based on this record, EPA reasonably made that determination, because on this record, we have 8x explanations, we also have 8x emissions inventory data that they provided, primarily with respect to the thresholds, but also they have their emissions inventory data for all of these counties. For example, this explanation is also based on 8x experience, with respect to each of the areas for which it has regulatory authority. To give an example, we have Hayden County, which is non-attainment for PM10, and in the record, Petitioner's Excerpt of Record 69, we have identification that Hayden County has windblown dust of 2,000 tons per year, mining sources contribute 3,000 tons per year, and all other point sources in the non-attainment area, which would include agricultural emissions from non-fugitive sources, are less than 10 tons per year. So in other words, the agricultural sources are a component of 0.2% of point source emissions. That's also part of Arizona's experience with regulating in its jurisdictional areas, in particular agricultural sources, the point sources represent 0.2% of emissions. And given that background, and these are facts in the record, the state and EPA can conclude that when we're talking about agricultural source exemptions, which are either fugitive emissions, or if there are non-fugitive emissions, they're most likely internal combustion engines, which are subject to other regulatory programs, which then triggers permitting requirements here, you end up with a very limited number of sources that are going to be exempted by this agricultural equipment exemption. And given that greater picture and context,  in my remaining time, unless you have questions on the farm exemption, I'll turn to the thresholds. With respect to the thresholds, the data shows that the minor new source program that ADEC implements will cover a sufficiently large percentage of stationary source emissions. And the question then becomes, are further regulations necessary to assure achieving the NAAQS? And here EPA reasonably determined that the answer is no, further regulation is not needed. ADEC has not excluded sources that needed regulation in order for the areas in ADEC's jurisdiction to attain or maintain the NAAQS. And this isn't setting an arbitrary percentage of current annual emissions. ADEC looked at two different potential percentages of significant emission reductions and determined, based upon their analysis of the emissions, that using the 50% threshold that they adopted, that it would cover 95% of all sources that were within their particular jurisdictions. And what is left is that for most pollutants, less than 5% of the smallest sources, or those that emit less than 5% of emissions, are not covered. And in this context, that is a sufficient threshold to assure that the National Ambient Air Quality Standards can be achieved. And here I'd like to again go to a concrete example. Petitioners in their reply brief highlight Miami County. And Miami suffered dioxide as a non-attainment criteria in Miami County. Miami County has a large smelter, and that is the primary source of sulfur dioxide emissions in that county. And in order to attain the sulfur dioxide NAAQS, what Arizona is doing is using regulations and controls under its SIFT to bring that large smelter's emissions of SO2 down so that the area will be in attainment. It has not chosen, and it has decided it is not necessary, to further regulate very small sources of emissions. And this is particularly salient here, because if you look at the data that Arizona provided under their threshold system, their minor new source review and major new source review will cover 100% of the SO2 emissions in Miami County. Given that data, there is not a need to address additional sources when all of the sources are currently being subject to new source review. I would note that... I have seven seconds. Let me conclude. What we have here, Your Honor, is petitioners have thrown all kinds of possibilities against the wall. Renewable natural gas, concentrated animal feeding operations. Miami County. All of these speculative things that say, oh, what about this, what about that, what about this? But if you actually look at each one of those speculations, there is not any evidence in the record that shows that any of those sources will result in not attaining the NAAQS. Therefore, the petition for review should be denied. All right. Thank you, Counsel. Your Honors, I'd like to begin by addressing the assertion that our claims are purely based on speculation by pointing out that the state bears the responsibility for demonstrating that its plan will assure compliance with the NAAQS. As we've discussed, what we've done here is point out the gaps. We've pointed out the extent of the missing information by proffering examples, but we don't bear the onus of showing what specific sources might be falling within the exemptions. Yet we've still offered anaerobic digesters, an emerging technology, and concentrated animal feeding operations. And there are more, I'm sure of it. So to try to shift the burden onto us is a misreading of the Clean Air Act requirements and EPA's regulations. I'd also like to point out that EPA is still relying on experience alone to justify why these exemptions are small and inconsequential to the EPA. And why is relying on experience a problem? Experience and knowledge should be able to translate into evidence that actually ends up in the record. And a blanket conclusory assertion of experience would effectively justify any agency action if it's taken as fact that supports an agency's conclusions. Again, giving nothing for a court to analyze or the public to push back on. It's a dangerous area where an agency can say, we know best, and other branches of government and the public have no means of contradicting that. Well, Counselor, you've had every opportunity. You've been given an opportunity to comment, and EPA has responded to your comments. And the question is whether they were arbitrary and capricious in the way that they decided this and the way they responded to your comments. But you haven't been denied any opportunity to comment here, have you? Correct, Your Honor. We've been able to comment. And as a court, we're responsible for serving as sort of a backstop, a regulatory backstop. But we're not the decider here. EPA has the expertise and not us. So when you say that we can't just defer to the agency's expertise, well, that's precisely what this court is responsible for doing within certain boundaries. I'll leap on that last phrase, within certain boundaries, because the court is supposed to defer to the agency when the agency has brought its technical expertise to bear. Here we have no evidence that it has. Here we just have a statement that it has. That hasn't translated into any evidence that's in the record supporting EPA's conclusion that fugitive emissions are the majority of emissions from agricultural operations or that most equipment that's co-located with agricultural equipment will be regulated under a new source performance standard, such that it doesn't fall within the exemption. EPA's experience should be able to translate into real evidence, real facts. And courts have recognized that and specifically addressed the failure of a conclusory statement to amount to a fact in the record that supports an agency conclusion, rendering it arbitrary. You know, if it's not factually supported. I'd also like to note for the court that fugitive dust is not the only pollutant relevant here under the ambient air quality standards. Nitrogen oxides, sulfur oxides, fugitive dust certainly is a large problem in Arizona, but other pollutants also pose a serious concern. And those are not always in the form of fugitive emissions. Oftentimes they will come out of a stack, like emissions from a diesel engine, for example, that's used on a farm. I'd also like to point out that EPA is still relying on annual emissions thresholds and assessments of annual emissions to justify compliance with hourly ambient air quality standards. I pointed out how EPA was doing this with respect to the permitting thresholds, where it's using the significant emissions rates to assert that somehow that will translate into compliance with hourly NAAQS. But it's actually also doing that with respect to the agricultural equipment exemption, where it's relying on the statement that 0.2% of fugitive emissions are attributable to agricultural equipment. Again, those are annual emissions, and there's a 24-hour standard that applies to particulate matter. So use of an annual emissions figure to determine hourly compliance, again, falls within that speeding analogy, where if you spread out a violation over enough time, you can average out and basically erase that violation. You can smooth out the average if the averaging period is long enough. Unless there are any further questions, Your Honors, I would like to reiterate our request that you vacate the unlawful portions of the rule because the facts do not support EPA's conclusions, and EPA did not consider important parts of the problem. Thank you. Thank you, Council. Thank you both for your argument in briefing this case. This matter is submitted.
judges: BYBEE, OWENS, Rakoff